740 So.2d 9 (1999)
STATE of Florida, Appellant,
v.
Maurice ROBINSON, Appellee.
No. 98-338.
District Court of Appeal of Florida, First District.
March 19, 1999.
*10 Robert A. Butterworth, Attorney General; Stephen R. White, Assistant Attorney General, Tallahassee, for Appellant.
Nancy Daniels, Public Defender; Glen Gifford, Assistant Public Defender, Tallahassee, for Appellee.
*11 BROWNING, J.
The State of Florida appeals an order granting Maurice Robinson's motion to suppress crack cocaine found in Robinson's pocket during a search by the police.[1] The State contends that the trial court (1) misapprehended the law under the United States Constitution and Florida Constitution governing the permissible scope of a police officer's questioning of a citizen, (2) erred in failing to assess the credibility of the two witnesses at the suppression hearing, who gave conflicting accounts of the facts that led to Robinson's arrest; and (3) erred in failing to make a determination as to the material issue of consent. We agree with the State's position that the trial court's application of the wrong test for determining the permissible scope of the deputy's investigation of Robinson, and the court's failure to decide whether Robinson gave consent, constitute reversible error. We reverse the suppression order and remand for further proceedings in light of the standards set forth in this opinion. State v. Luckay, 697 So.2d 221 (Fla. 5th DCA 1997) (reversing suppression order and remanding for further consideration, where trial court applied erroneous rule of law to facts); State v. Carr, 642 So.2d 57 (Fla. 2d DCA 1994) (trial court's dismissal of charges of dealing in stolen property, upon finding objective entrapment of defendant, was reversed and remanded for application of the proper subjective entrapment test).

Initial Contact Between Deputy and Robinson
At the suppression hearing, Deputy Custer testified that around 10:45 P.M. on September 11, 1997, he had been in uniform and on routine patrol in a marked cruiser in the neighborhood that he patrolled for approximately one year. A student was assigned to him from the naval photography school and accompanied him in civilian clothes. With the car windows down, the deputy heard a lot of dogs barking and observed Robinson standing outside a fenced yard about ten feet from the road. The dogs were inside the fenced area. Robinson was partially facing the residence, but the deputy did not know whether he was a friend of anyone living there. Being a dog owner himself, the deputy considered the barking to be unusual at that hour of the night. He believed the barking was the dogs' way of defending their own property, and he testified that his dogs do not bark when he returns home. The house appeared to be unlit, and no one seemed to be up. Without activating the blue light or the siren, the deputy pulled off the road, and he and the student exited the vehicle.
Deputy Custer testified further that, while on patrol, he customarily identifies himself and asks an individual how and what he is doing. Custer said that he approached Robinson with his police weapon still holstered. When he asked what Robinson was doing, Robinson replied that he was there to visit a friend. At the hearing, the deputy could not remember whether he had asked for the name of the person whom Robinson purportedly was visiting. The deputy asked for identification, whereupon Robinson produced a Florida driver's license that came back negative for outstanding local warrants. At some point, a man in a wheelchair came out to the front porch. When the deputy asked whether he had anything illegal on him such as a weapon or narcotics, Robinson mentioned that he had a common pocket knife. What happened subsequently was disputed at the suppression hearing.
As to the initial contact with Deputy Custer, Robinson testified that on the night in question, he had been there to see Bobby Knowles, who lived at the residence. Robinson had called out for Bobby to come outside because the dog would not let anyone enter the yard. According to *12 Robinson, only one dog, a chow, was in the Knowles' yard, and the noise was coming from a bunch of Rottweilers located across the street in Mr. Talley's yard. Robinson said that Knowles' brother, who is an invalid, is the man who came out to the front porch. Robinson said that when the deputy asked for identification, Robinson retrieved a driver's license from his billfold but was shaking because of a nervous condition. When the deputy asked why he was nervous, Robinson mentioned the guy who was taking flash photographs of him and Robinson asked what was going on. When the deputy asked about a weapon, Robinson told him about the pocket knife in his pocket. This much of Robinson's testimony is consistent with that of Deputy Custer. The subsequent events are in dispute.
At least up to this point, the contact between Deputy Custer and Robinson was "only minimal." Popple v. State, 626 So.2d 185, 186 (Fla.1993). The Supreme Court of Florida has recognized "essentially three levels of police-citizen encounters." Id.
The first level is considered a consensual encounter and involves only minimal police contact. During a consensual encounter a citizen may either voluntarily comply with a police officer's requests or choose to ignore them. Because the citizen is free to leave during a consensual encounter, constitutional safeguards are not invoked. United States v. Mendenhall, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).
The second level of police-citizen encounters involves an investigatory stop as enunciated in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). At this level, a police officer may reasonably detain a citizen temporarily if the officer has a reasonable suspicion that a person has committed, is committing, or is about to commit a crime. § 901.151, Fla. Stat. (1991). In order not to violate a citizen's Fourth Amendment rights, an investigatory stop requires a well-founded, articulable suspicion of criminal activity. Mere suspicion is not enough to support a stop. Carter v. State, 454 So.2d 739 (Fla. 2d DCA 1984).
While not involved in the instant case, the third level of police-citizen encounters involves an arrest which must be supported by probable cause that a crime has been or is being committed. Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959); § 901.15, Fla. Stat. (1991).
Popple, 626 So.2d at 186. "So long as a reasonable person would feel free `to disregard the police and go about his business,' [citation omitted] the encounter is consensual and no reasonable suspicion is required." Florida v. Bostick, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991), quoting California v. Hodari D., 499 U.S. 621, 628, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991).[2] "An officer may initiate contact with an individual without creating a search and seizure situation." Luckay, 697 So.2d at 222 (reversing suppression order, where trial court erroneously ruled that, as a matter of law, a person being questioned about criminal conduct would reasonably believe he or she was in custody). Given the body of case law holding that an officer may approach an individual on the street or in another public place and inquire as to his or her reason for being there, and may request to see identification, without triggering constitutional safeguards regarding "seizures," we conclude that under any view of the aforementioned evidence, Deputy Custer's initial contact with Robinson constituted nothing more than a routine and proper police-citizen consensual encounter. See Bostick, 501 U.S. at 434-35, 111 S.Ct. *13 2382; Florida v. Royer, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); State v. Baldwin, 686 So.2d 682, 685 (Fla. 1st DCA 1996).
The trial court made the following remarks during argument of counsel after the witnesses testified at the suppression hearing:
The State makes a point that there's a difference between a citizen encounter and a Terry stop. I don't dispute any of that. But by the same token, even on a citizen encounter there has to be some basisI mean, some police officer cannot just walk up to any citizen they [sic] want to and say hey, Mr. Citizen, I'm getting ready to make an encounter with you, what are you doing here, and what is your name and show me some identification. That is not the purpose of a citizen encounter.
I understand very well the difference between a citizen encounter and a Terry stop. I don't know that Mr. Custer [the deputy] understands the difference between a citizen encounter and a Terry stop. But again, he had this photographer with him, and they were going to see some action that night. Even if Mr. Custer, in hearing these barking dogs that were so unusual, believed that something underhanded was going on, he asked Mr. Robinson what are you doing there? He said I'm here to see a friend. He didn't ask him who, he didn't ask him where does he live. He did zero in trying to make a good-faith investigation of what Mr. Robinson was doing there, even if he should have been there in the first place, even asking him questions.
When he says I'm here to visit a friend, how hard is it to say what is his name, where does he live, and when the guy comes out on, the wheelchair guy comes out on the porch, to say hey, does Joe Blow live here, the name that Mr. Robinson would have given him. And if the guy would have said oh, yeah, he lives here, he's my brother, then what is the big deal?
But Mr. Custer does not do that. He makes an incomplete encounter with somebody and jumps from square one to square ten, and he forgets about two, three, four, five, six, seven, eight and nine.
As the State has pointed out, these comments indicate the lower tribunal's misapprehension of the federal and state law governing the circumstances surrounding Deputy Custer's initial contact with Robinson.[3] Custer and Robinson offered substantially the same version of the facts up to the point when the deputy asked whether Robinson had a weapon or narcotics on his person. In requiring the deputy to give some articulable basis for approaching Robinson, for asking his purpose for being there, and for requesting to see some identification, the trial court erroneously assumed a requirement that neither federal nor Florida law imposes on the State under these circumstances. United States v. Edwards, 898 F.2d 1273, 1276 (7th Cir. 1990) (in consensual encounter, "the degree of suspicion that is required is zero"); State v. Albritton, 664 So.2d 1049 (Fla. 2d DCA 1995); State v. Hughes, 562 So.2d 795, 796 (Fla. 1st DCA 1990) (officer needs no basis for approaching individual in public place, identifying himself as an officer, and asking questions).

The Deputy's Search of Robinson
In the interest of assuring, on remand, a complete resolution of the issues raised in the suppression hearing, we address one other remark made by the trial court at the close of all evidence:
First of all, I don't think this comes down to whether or not the trier of fact *14 believes or disbelieves the arresting officer as to the consent question.
It is the trial court's duty to decide the credibility of witnesses. In determining whether the consensual encounter between Deputy Custer and Robinson escalated to another level under Popple, the trial court was faced with directly conflicting eyewitness accounts of what ensued after Robinson acknowledged having the pocket knife in his pocket. Because the proper resolution of the motion to suppress hinged on whether Robinson consented, the trial court was, indeed, required to assess the credibility of the two witnesses and to decide the issue of consent.
Consent was in question because Deputy Custer testified that he had asked for consent to search Robinson's person and that Robinson agreed. The deputy could not recall whether the consent had been verbal or gestural, such as with a nod of the head or some other body language. Custer said that he had asked Robinson to turn toward the police car and to place his hands on the back of the cruiser for the rear pat-down, and to turn around for a frontal search. During the search, the deputy discovered crack cocaine in Robinson's shirt pocket, and Robinson was arrested.
According to Robinson, as soon as he told Deputy Custer about the pocket knife, the deputy said "Well, I'm going to search," and he told Robinson to put up his hands. Robinson testified that the deputy never asked for his consent or indicated verbally that Robinson was free to leave.
The proper resolution of the motion to suppress depends on whose testimony the trial court believed. If the trial court were to find that Robinson voluntarily chose to remain at the scene and consented to a lawful personal search, then Robinson would lack any basis pursuant to the Fourth Amendment for challenging the search and his subsequent arrest. Bostick, 501 U.S. at 434-35, 111 S.Ct. 2382 (encounter will not trigger Fourth-Amendment scrutiny unless it loses consensual nature); Shapiro v. State, 390 So.2d 344, 348 (Fla.1980) (consent provides one of the exceptions to Fourth-Amendment requirement of a probable cause basis for a search); Baldwin, 686 So.2d at 686; State v. Mitchell, 638 So.2d 1015 (Fla. 2d DCA 1994); State v. Walden, 464 So.2d 691 (Fla. 5th DCA 1985). That is, a police-citizen encounter "will not trigger Fourth Amendment scrutiny unless it loses its consensual nature." Bostick, 501 U.S. at 443, 111 S.Ct. 2382.
On the other hand, Robinson's version of events, if found credible, could support the conclusion that the initial police-citizen encounter (a "first level" occurrence under Popple) rose to the "second level" (an investigatory stop and seizure), for Fourth Amendment purposes, if a reasonable person would have felt he was not free to leave. At the hearing, the defense argued that Deputy Custer lacked anything more than a bare suspicion of criminal activity, which is not a proper basis for even a temporary detention. Robinson v. State, 556 So.2d 450 (Fla. 1st DCA 1990) (where officers lacked reasonable suspicion to justify investigatory stop of defendant, rock of crack cocaine and single-edged razor blade retrieved in non-consensual post-arrest search should have been suppressed); Carter v. State, 454 So.2d 739 (Fla. 2d DCA 1984). Where a stop is illegal, a defendant's subsequent verbal consent to a search will not cure the taint. Scott v. State, 696 So.2d 1335 (Fla. 4th DCA 1997) (where officer lacked a well-founded, articulable suspicion of past, present, or imminent criminal activity to justify investigatory stop of defendant, defendant's verbal consent to search did not remove taint, and conviction had to be reversed).
The State had the burden to prove by a preponderance of the evidence (from the totality of the circumstances) the voluntariness of the search. Denehy v. State, 400 So.2d 1216, 1217 (Fla.1980). On remand, the trial court is directed to apply the objective test to determine whether *15 Robinson was "seized." Resolution of this question will require the trial court to determine whether Robinson gave valid consent to the search. In general, factors that might tend to demonstrate a seizure, even when a defendant did not attempt to leave, include the threatening presence of several officers, an officer's display of a weapon, some physical touching of a defendant, or the use of language or a tone of voice indicating that compliance with an officer's request might be compelled. Mendenhall, 446 U.S. at 554, 100 S.Ct. 1870. Contrary to the trial court's supposition, the credibility of the witnesses must be decided because their testimony directly conflicted on the question of whether Robinson gave consent. Given the discrepancies in the two witnesses' testimony, the lower court erred in declining to rule on this material issue. See State v. Martin, 532 So.2d 95 (Fla. 4th DCA 1988) (reversing suppression order and remanding for trial court to determine whether police retained defendant's driver's license and Greyhound bus ticket throughout encounter or promptly returned them to defendant, where former conduct could transform an encounter to a seizure if defendant's freedom was thereby restrained); State v. Hill, 504 So.2d 407 (Fla. 2d DCA 1987) (trial court reversibly erred in declining to decide critical issue of whether taped conversation occurred inside or outside defendant's home, and whether conversation took place with State's witness' consent).
The suppression order is REVERSED, and the case is REMANDED, for further proceedings.
ALLEN and WEBSTER, JJ., CONCUR.
NOTES
[1] Pursuant to Florida Rule of Appellate Procedure 9.140(c)(1)(B), the State may appeal an order suppressing evidence obtained by search and seizure.
[2] Because the trial court determined search and seizure issues, the applicable United States Supreme Court precedents control pursuant to the conformity clause. Art. I, § 12, Florida Constitution; Holland v. State, 696 So.2d 757, 759 (Fla.1997); Perez v. State, 620 So.2d 1256 (Fla.1993).
[3] The trial court's application of the law to its factual findings is subject to de novo review. Ornelas v. United States, 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); Williams v. State, 721 So.2d 1192 (Fla. 1st DCA 1998); Butler v. State, 706 So.2d 100 (Fla. 1st DCA 1998).