945 So.2d 1174 (2006)
Lorenzo GOLPHIN, Petitioner,
v.
STATE of Florida, Respondent.
No. SC03-554.
Supreme Court of Florida.
December 14, 2006.
*1177 James S. Purdy, Public Defender and Noel A. Pelella, Assistant Public Defender, Seventh Judicial Circuit, Daytona Beach, FL, for Petitioner.
Charles J. Crist, Jr., Attorney General, Wesley Heidt and Kellie A. Nielan, Assistant Attorneys General, Daytona Beach, FL, for Respondent.
PER CURIAM.
We have for review the decision in Golphin v. State, 838 So.2d 705 (Fla. 5th DCA 2003), which certified conflict with the decision in Baez v. State, 814 So.2d 1149 (Fla. 4th DCA 2002), quashed, 894 So.2d 115 (Fla.2004). We have jurisdiction. See art. V, § 3(b)(4), Fla. Const. For the reasons that follow, we determine that the totality of the circumstances of Golphin's encounter with law enforcement indicates that he was not seized for purposes of the Fourth Amendment when the police officer held in her hand at that specific site the identification he had consensually and voluntarily provided and viewed it as she conducted a computerized check for warrants in his presence and without moving away from that location where the identification had been consensually and voluntarily produced. Further, even if the encounter had amounted to a seizure, we conclude that the evidence discovered during the search of Golphin need not be suppressed pursuant to the application of the three-part test announced in State v. Frierson, 926 So.2d 1139 (Fla.2006). We therefore approve the decision of the Fifth District Court of Appeal.

FACTS
The instant action arises from a decision of the Fifth District Court of Appeal affirming the trial court's denial of Golphin's motion to suppress drug evidence discovered on his person during the course of a search incident to an arrest on an outstanding warrant. See Golphin v. State, 838 So.2d 705 (Fla. 5th DCA 2003). On the evening of November 13, 2002, Officers Maria Deschamps and Lindsey Doemer were on patrol in the area of Taylor Avenue and Ridgewood Avenue in Daytona Beachan area well known for prostitution and narcotics traffic. The officers had been dispatched to conduct field interviews of possible prostitutes and other individuals in this area. Upon observing a group of approximately five men near the corner of Taylor and Ridgewood, the officers parked on the opposite side of the street, exited their vehicle, walked across the street and approached the group. As the officers approached, some individuals began to leave the area, but at least one ultimately remained to speak with the officers.
Officers Deschamps and Doemer parted, with Officer Doemer moving to approach Golphin. It is uncontroverted that although others in the group walked away, Golphin never attempted to leave the area. Officer Doemer requested Golphin's identification, *1178 which he voluntarily provided, and apparently without moving away simply commenced a computer check for outstanding warrants. A male officer who was part of a K-9 unit also arrived on the scene as the events were unfolding, although apparently after identification had been consensually produced.
After Officer Doemer had initiated the computer check, but prior to obtaining any results, Golphin made a statement that he might have an open warrant. The system reported that there was an outstanding warrant for his arrest, and Golphin was arrested. The male officer affiliated with the K-9 unit who had arrived on the scene then assisted in the search incident to that arrest. This search revealed drugs and paraphernalia giving rise to the charges underlying the instant matter.
Golphin submitted a motion to suppress the drug evidence, arguing that the encounter was not consensual and that he had been unlawfully seized when the officer held his identification while initiating the computer check process. Golphin further argued that the unlawful seizure resulted in the discovery of the arrest warrant, subsequent arrest, and incidental search which revealed the drug evidence. The trial court concluded that the warrant was discovered as a result of a consensual encounter and denied Golphin's motion. See Golphin, 838 So.2d at 706. Golphin appealed the trial court's ruling, relying on the decision in Baez v. State, 814 So.2d 1149 (Fla. 4th DCA 2002), in which the Fourth District held that an otherwise consensual encounter matures into a seizure when an officer retains a person's identification for the purposes of conducting a warrants check.
In affirming the trial court's determination, the Fifth District expressly disagreed with the Fourth District's decision in Baez and certified a conflict to this Court. The Fifth District rejected what it perceived to be a bright line rule regarding the impact of retaining an individual's identification, and relied upon the United States Supreme Court's decision in Florida v. Bostick, 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991), as providing the proper "totality of the circumstances" analysis. See Golphin, 838 So.2d at 706-07. Applying that standard to the facts of the case, the Fifth District determined:
In sum, we believe Baez[[1]] to be wrongly decided first, because it creates a per se rule, which the Supreme Court in Bostick rejected in favor of the "totality of the circumstances" test, and second, because it reaches what we believe to be the wrong conclusion when the proper test is applied. See People v. Cole, 256 Ill.App.3d 590, 194 Ill.Dec. 545, 627 N.E.2d 1187 (1994).
In applying the Bostick test to the instant case, we conclude that the trial *1179 court properly denied the motion. The police behavior in approaching the men obviously failed to communicate an intent to restrict the men. Indeed, some of the men walked away from the police without incident. There was no indication that police sought out Appellant or threatened him or intimidated him in any way. Appellant was fully cooperative and volunteered information about his arrest history. Finally, Appellant did not manifest any desire to leave, nor did he request that his identification be returned. The police communicated nothing, by word or act, to lead Appellant to reasonably conclude that he was not free to leave.
The trial judge found that Appellant consented to the encounter with police, and we concur that Appellant's consent, when all circumstances are considered, was not the product of intimidation or harassment as viewed from the position of a reasonable person.
Golphin, 838 So.2d at 708. The Fifth District certified a conflict with the Fourth District's decision in Baez.[2] This Court accepted jurisdiction, see Golphin v. State, 888 So.2d 17 (table) (Fla.2004), and the instant review followed.

ANALYSIS

WHETHER A SEIZURE OCCURRED
The Fourth Amendment to the United States Constitution and section 12 of Florida's Declaration of Rights guarantee citizens the right to be free from unreasonable searches and seizures. See U.S. Const. amend. IV; art. I, § 12, Fla. Const. Florida's constitutional protection expressly provides that the right shall be construed in conformity with the Fourth *1180 Amendment to the United States Constitution, as interpreted by the United States Supreme Court. See art. I, § 12, Fla. Const. Items obtained in violation of Florida's constitutional protection shall be excluded from evidence if such items would be excluded pursuant to United States Supreme Court jurisprudence. See id.
The Fourth Amendment requires all warrantless "seizures" of a person to be founded upon at least reasonable suspicion that the individual seized is engaged in wrongdoing. See United States v. Mendenhall, 446 U.S. 544, 552, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (plurality opinion); see also Terry v. Ohio, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (determining that reasonableness will depend on the existence of specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion). This requirement "governs all seizures of the person, `including seizures that involve only a brief detention short of traditional arrest.'" Mendenhall, 446 U.S. at 551, 100 S.Ct. 1870 (plurality opinion) (quoting United States v. Brignoni-Ponce, 422 U.S. 873, 878, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975)).
Not all encounters between law enforcement and individual citizens, however, constitute "seizures." See Terry, 392 U.S. at 19 n. 16, 88 S.Ct. 1868 ("Obviously, not all personal intercourse between policemen and citizens involves `seizures' of persons."). As the United States Supreme Court has determined: "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a `seizure' has occurred." Id. This Court has defined three levels of police-citizen encounters. See Popple v. State, 626 So.2d 185 (Fla.1993). First are those referred to and defined as "consensual encounters," which involve minimal police contact and do not invoke constitutional safeguards. See id. at 186. "During a consensual encounter a citizen may either voluntarily comply with a police officer's requests or choose to ignore them." Id. Second are those designated investigatory stops, at which time a police officer "may reasonably detain a citizen temporarily if the officer has a reasonable suspicion that a person has committed, is committing, or is about to commit a crime." Id. (citing § 901.151, Fla. Stat. (1991)).[3] The third level is an arrest, which must be supported by probable cause that a crime has been or is being committed. See id.
The State does not contend that the actions of Officers Deschamps and Doemer were predicated on reasonable articulable suspicion that Golphin was engaged in criminal activity.[4] Indeed, the record establishes that the officers were only engaged in general field interviews in this area known for narcotics and prostitution and approached the group of men simply, in Officer Doemer's words, to see "what they were up to." The rationale voiced by this officer clearly would not provide the requisite reasonable articulable suspicion necessary to justify any form of brief restraint of movement or seizure. See Popple, 626 So.2d at 186; see also Brown v. Texas, 443 U.S. 47, 52, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979) ("The fact that appellant was in a neighborhood frequented by drug users, standing alone, is not a *1181 basis for concluding that appellant himself was engaged in criminal conduct. In short, the appellant's activity was no different from the activity of other pedestrians in that neighborhood."). The United States Supreme Court has stated that law enforcement officers do not violate the Fourth Amendment's prohibition against unreasonable seizures merely by approaching individuals on the street and asking them questions if they are willing to listen. See United States v. Drayton, 536 U.S. 194, 200, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002). Thus, the legal question presented in this matter is whether Golphin had been seized at any point for purposes of the Fourth Amendment considering the totality of circumstances which followed. If so, then this Court must necessarily conclude that any seizure that occurred at any point without the necessary basis in a reasonable articulable suspicion of criminal activity violated Golphin's Fourth Amendment rights.
The State posits that the encounter at issue here was in all aspects consensual, and that the retention of the identification as it occurred here for purposes of conducting a warrants check did not elevate the encounter into an investigatory stop for which a reasonable articulable suspicion of criminal activity was necessary to avoid constitutional problems. On the other side, Golphin argues that the encounter was not consensual because he did not feel free to walk away and end the police inquiry. Golphin supports his argument by contending that the police officers had summoned back one man who had attempted to depart, that the police cruiser was parked in such a manner as to block his egress from the area, and that he feared the police dog in the vehicle that subsequently arrived on the scene would chase him if he attempted to leave.
The trial court accepted the State's position in determining that the conduct of the officers did not constitute a show of authority that would have caused a reasonable person to believe that he or she was not free to walk away. Important to the trial court's assessment was the fact that the officers approached without lights, sirens or weapons drawn, and did not instruct Golphin to stop or compel the individual who left the area to return. The trial court credited the officers' testimony that the group of men, including Golphin, had been approached in casual conversation and that Golphin freely, consensually, and voluntarily produced his identification.[5]
The district court accepted the trial court's findings and agreed with its legal analysis. Relying on the United States Supreme Court's decision in Florida v. Bostick, 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991), the district court concluded that the police behavior in the present matter "obviously failed to communicate an intent to restrict the men." Golphin, 838 So.2d at 708. The district court specifically noted that "some of the men walked away from the police without incident" and that the record did not establish that the police threatened or harassed Golphin in any way. Id. The district court also relied on record evidence showing that Golphin fully cooperated with the police, volunteered information regarding his criminal history, and never manifested any desire to leave the area. See id. On this basis, the district court concluded "[t]he police communicated *1182 nothing, by word or act, to lead [Golphin] to reasonably conclude that he was not free to leave." Id.
As with the district court below, this Court will "accord a presumption of correctness to the trial court's rulings on motions to suppress with regard to the trial court's determination of historical facts," but "independently review mixed questions of law and fact that ultimately determine constitutional issues" in the Fourth Amendment context. Globe v. State, 877 So.2d 663, 668-69 (Fla.2004) (quoting Nelson v. State, 850 So.2d 514, 521 (Fla.2003)). In so doing, we are guided by the evolution of the parameters of what constitutes a "seizure" under Fourth Amendment and Florida jurisprudence.
Formal arrest is the ultimate form of "seizure of a person." See California v. Hodari D., 499 U.S. 621, 624, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). In the absence of a formal arrest, whether or not a person has been seized will be adjudged in accordance with the reasonable person standard initially articulated by the United States Supreme Court in United States v. Mendenhall, 446 U.S. 544, 554-55, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (plurality opinion). There the High Court stated:
We conclude that a person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person.
Id. at 554-55, 100 S.Ct. 1870 (plurality opinion) (citations and footnote omitted). This Court has similarly provided:
Although there is no litmus-paper test for distinguishing a consensual encounter from a seizure, a significant identifying characteristic of a consensual encounter is that the officer cannot hinder or restrict the person's freedom to leave or freedom to refuse to answer inquiries, and the person may not be detained without a well-founded and articulable suspicion of criminal activity. This Court has consistently held that a person is seized if, under the circumstances, a reasonable person would conclude that he or she is not free to end the encounter and depart.
Popple, 626 So.2d at 187-88 (citation omitted).
Implicit in the reasonable person standard is the notion that if a reasonable person would feel free to end the police encounter, but does not, and is not compelled by the police to remain and continue the interaction, then he or she has consented to the encounter. It is on that basis that both the trial court and district court below determined that Golphin's encounter with Officer Doemer, including his act of providing her with his identification, was consensual in nature. Golphin did not preserve and we have not been asked to separately consider, and indeed do not decide, whether or not Golphin after consensually and voluntarily producing identification specifically consented to Officer Doemer using that identification in his presence to conduct a warrants check or how the lack of any such *1183 consent might impact the analysis in this case. Golphin did not argue below[6] that any consent implied by the production of his identification extended only to the examination of its validity, which was undermined or eviscerated when the officer used the identification for the further purpose of conducting a warrants check in his presence. Circumstances may exist in which an officer's conduct exceeds the scope of consent that reasonably can be implied by the act of handing over one's identification, and such circumstances may indicate that a seizure has occurred.[7] That is not, however, an issue currently before this Court.
Applying the reasonable person standard to determine whether a seizure has occurred is a fact-intensive analysis in which the reviewing court must consider the totality of the circumstances. As stated by the United States Supreme Court in Florida v. Bostick, 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991):
We adhere to the rule that, in order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.
Id. at 439, 111 S.Ct. 2382.
The seizure analysis has not traditionally permitted the establishment of bright line rules. Nearly a decade after the United States Supreme Court's determination that we had erred in establishing a per se prohibition on drug interdiction efforts known as "bus sweeps," see id. at 435, 111 S.Ct. 2382, it again rejected the Eleventh Circuit's creation of a per se rule that would suppress any evidence obtained during bus sweeps in the absence of the police warning the passengers that they may refuse to cooperate. See United States v. Drayton, 536 U.S. 194, 202, 206, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002). Instead of a *1184 per se rule, the Drayton Court again applied a totality of the circumstances analysis in determining that no seizure had occurred where the officers did not compel answers to their questions, did not brandish weapons or make any intimidating movements, left the aisle free so that passengers could exit, spoke to passengers one by one and in a polite, quiet voice, and said nothing that would suggest to a reasonable person that he or she was barred from leaving the bus or otherwise terminating the encounter. See id. at 203-04, 122 S.Ct. 2105. As in Drayton, the present analysis does not turn solely on any one factor, but must be informed by the total circumstances of the officers' approach, their comportment, Golphin's reaction, and the circumstances surrounding the request for his identification as well as the subsequent warrants check.
While bright line rules have been rejected in this context, decades of the utilization of the reasonable person standard has yielded roughly contoured categories of police conduct which will not usually trigger Fourth Amendment concerns. Pertinent to the instant analysis, a police inquiry regarding an individual's identity and accompanying request for identification has not typically constituted a "seizure" for Fourth Amendment purposes, as long as the police have not communicated the message that compliance with their inquiries is required.[8]See Bostick, 501 U.S. at 435, 111 S.Ct. 2382 (concluding that police may "generally ask questions of [an] individual, ask to examine the individual's identification, and request consent to search his or her luggageas long as the police do not convey a message that compliance with their requests is required"); see also Drayton, 536 U.S. at 197, 122 S.Ct. 2105 (stating that the Fourth Amendment "permits police officers to approach bus passengers at random to ask questions and to request their consent to searches, provided a reasonable person would understand that he or she is free to refuse"); Immigration & Naturalization Serv. v. Delgado, 466 U.S. 210, 216, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984) ("[I]nterrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure."); Royer, 460 U.S. at 501, 103 S.Ct. 1319 (plurality opinion) (determining that law enforcement officers asking for and examining *1185 an individual's airline ticket and driver's license were permissible in themselves).
While a noncompulsory request for an individual's identification has been unlikely to implicate the Fourth Amendment in isolation, the retention of identification during the course of further interrogation or search certainly factors into whether a seizure has occurred. Indeed, the United States Supreme Court addressed the retention of identification and travel documents in Royer as the High Court distinguished that case from its earlier determination in Mendenhall. In both cases, narcotics agents approached persons traveling through major airports who were perceived to fit a drug courier profile and requested their travel documents and identification. See Royer, 460 U.S. at 493, 103 S.Ct. 1319; Mendenhall, 446 U.S. at 547, 100 S.Ct. 1870. Similarly, in both cases, these individuals ultimately consented to searches that revealed illicit drugs. See Royer, 460 U.S. at 494-95, 103 S.Ct. 1319; Mendenhall, 446 U.S. at 548-49, 100 S.Ct. 1870.
In Mendenhall, two Justices determined that no seizure had occurred because the events evolved on a public concourse, the agents did not wear uniforms or display weapons, and the agents did not summon Mendenhall to their presence. See 446 U.S. at 555, 100 S.Ct. 1870. These Justices also remarked that the officials had "requested, but did not demand to see the respondent's identification and ticket." Id. In Royer, however, the High Court reached the opposite conclusion. A plurality of the United States Supreme Court rejected the State's assertion that the entire encounter was consensual, stating:
Asking for and examining Royer's ticket and his driver's license were no doubt permissible in themselves, but when the officers identified themselves as narcotics agents, told Royer that he was suspected of transporting narcotics, and asked him to accompany them to the police room, while retaining his ticket and driver's license and without indicating in any way that he was free to depart, Royer was effectively seized for the purposes of the Fourth Amendment.
Id. at 501, 103 S.Ct. 1319 (emphasis added). The plurality specifically distinguished the scenario presented in Mendenhall, stating:
The case before us differs in important respects. Here, Royer's ticket and identification remained in the possession of the officers throughout the encounter; the officers also seized and had possession of his luggage. As a practical matter, Royer could not leave the airport without them. In Mendenhall, no luggage was involved, the ticket and identification were immediately returned, and the officers were careful to advise that the suspect could decline to be searched.
Id. at 504 n. 9, 103 S.Ct. 1319 (emphasis added); accord Jacobson v. State, 476 So.2d 1282, 1285 (Fla.1985) (determining that stop in airport was not a seizure and relying, in part, on the fact that the "officers retained the suspects' identification and airline tickets only long enough to examine them, and promptly returned them") (emphasis added).
In United States v. Thompson, 712 F.2d 1356 (11th Cir.1983), the Eleventh Circuit applied the lessons from Royer and other airline ticket cases in determining that retention of an individual's driver's license had enhanced a consensual encounter into an investigatory stop. In that case, a Jacksonville Port Authority police officer approached the driver of a vehicle that had been parked in the garage for two weeks. Upon approach, the officer noticed that the *1186 driver had a circular object held to his nose which he moved to his lap, capped with a lid, and then moved to his side upon noticing the approaching officer. See id. at 1358. The officer asked the driver for his identification, determined that it appeared valid, but retained the identification while requesting to inspect the object Thompson had placed at his side. See id. The object which Thompson produced in response contained cocaine. See id. The Eleventh Circuit determined that the officer's conduct prior to requesting the object constituted an unlawful investigatory stop. In the court's words:
When [the officer] retained Thompson's license, the encounter matured into an investigative stop protected by the Fourth Amendment. Without his driver's license Thompson was effectively immobilized. A reasonable person in these circumstances would not have believed himself free to leave. If Thompson had tried to drive away he could have been arrested for driving without a license. . . .
. . . .
. . . Contrasted with a person whose airline ticket has been retained, a person in a car whose license has been retained has less reason to expect that he will be permitted to leave. While a person may theoretically purchase another airline ticket and proceed on his way, a driver whose license has been retained may drive away only at the risk of arrest. Thus, the airline ticket cases reinforce, if not compel, our conclusion that a driver whose license has been retained would not reasonably believe himself free to leave.
Id. at 1359-61.
Subsequently, the Eleventh Circuit refused to apply the analysis undertaken in Thompson to a case involving the retention of a pedestrian's identification.[9] In United States v. De La Rosa, 922 F.2d 675 (11th Cir.1991), a police officer followed the vehicle driven by De La Rosa into his apartment complex. After De La Rosa parked and exited his vehicle, an officer pulled behind De La Rosa's car, exited, and asked to speak with him. See id. at 677. De La Rosa agreed and produced his Georgia driver's license upon request. See id. Before returning the license, the officer asked for and received permission to search De La Rosa's vehicle. See id. The officer handed De La Rosa's identification to a second officer, searched the vehicle, and found evidence of narcotics trafficking. See id. De La Rosa ultimately admitted that he was in the cocaine business, and led officers to other locations where additional evidence was found. See id. at 678. Subsequent to his arrest, De La Rosa sought to suppress the evidence arguing that he consented to the searches only after he was unlawfully seized. See id. The Eleventh Circuit affirmed the district court's denial of the motion to suppress, determining that De La Rosa had not been seized notwithstanding the fact that the police had retained his license for a brief time. See id. The appellate court agreed with the trial court's reliance on the fact *1187 that De La Rosa had returned home for the evening and did not intend to use his vehicle in the immediate future. See id. In light of those circumstances, the circuit court determined that a reasonable person would have believed he was free to walk into his home and avoid further conversation with police. See id. The Court distinguished Thompson on the basis that De La Rosa was not intent on driving his vehicle at the time the police retained his license and thus, "temporary retention of the license did not preclude [De La Rosa] from terminating the encounter by going into his apartment." Id. at 678 n. 2.
The distinction between Thompson and De La Rosa is reflected in the reasoning employed in United States v. Jordan, 958 F.2d 1085 (D.C.Cir.1992). There, the circuit court determined that to decide whether a reasonable person would feel free to "disregard the police and go about his business," it becomes "crucial to focus on what the person's immediate `business' is, in order to decide if the police retention of his papers would likely impede his freedom to proceed with it." Id. at 1088. Applying that test, the appellate court determined that a seizure had occurred because when the identification was taken Jordan had intended to board a waiting car and depart the bus terminal parking lot. See id. The Jordan court indicated that the case would have posed a more difficult question if the police had requested and retained Jordan's identification as he stood in line to buy a bus ticket or had he been aboard the bus awaiting departure. See id.
In addition to the status of the individual as a driver or a pedestrian, federal courts have also considered the circumstances of the warrants check in determining whether a seizure has occurred. In United States v. Analla, 975 F.2d 119 (4th Cir. 1992), police received a call indicating that a person matching the description of the man wanted in connection with a robbery and murder was using a pay phone outside a convenience store. See id. at 121. Two officers approached the man, asked to speak with him, and requested his driver's license and registration. See id. at 122. Upon receipt of the documents, one officer radioed the dispatcher from his walkie-talkie to check for outstanding warrants, while another officer asked for permission to search Analla's car. See id. Analla consented and a pistol later identified as the murder weapon was retrieved from under the driver's seat. See id.
In affirming the district court's denial of Analla's motion to suppress, the Fourth Circuit determined that Analla was not seized when the officer approached and asked to see his license and registration. The court noted:
[The officer] necessarily had to keep Analla's license and registration for a short time in order to check it with the dispatcher. However, he did not take the license into his squad car, but instead stood beside the car, near where Analla was standing, and used his walkie-talkie. Analla was free at this point to request that his license and registration be returned and to leave the scene.
Id. at 124; cf. United States v. Johnson, 326 F.3d 1018, 1022 (8th Cir.2003) ("A reasonable person would not believe that he was free to leave a scene where three uniformed officers drew him away from their party, stood closely at either side of him, and took possession of his personal propertyhere, his driver's licensewhile conducting a brief interrogation.").
The interpretive case law supports the trial court's determination here that in light of the totality of the circumstances involved, Golphin's encounter with the police was consensual in nature, and did not mature into a seizure on the facts presented *1188 simply by virtue of Officer Doemer retaining and using Golphin's identification to conduct a warrants check. Giving due deference to the historical facts found by the trial court, the totality of the circumstances in this case demonstrates that police officers approached a group of men in a casual manner, without use of sirens, lights, or weapons, and without blocking the egress from the area. Certain of the men opted not to talk with the officers and walked away from the scene. Golphin, specifically, interacted primarily with a single officer. The officer engaged Golphin in a casual manner, requested his identification (which he voluntarily provided), and conducted a warrants check in Golphin's presence while continuing to talk in a polite manner with Golphin regarding his criminal record and other issues. Golphin was polite and cooperative throughout the encounter. Once the officer confirmed the open warrant for Golphin's arrest, Golphin was arrested and another officer assisted in conducting the incident search. This is not a case in which Golphin was summoned to the presence of multiple officers, isolated by them in any way, or encountered in a way that would communicate that he was not free to go. Cf. Johnson, 326 F.3d at 1022.
Moreover, at the time he was approached, Golphin was not the driver of a vehicle such that abandoning his driver's license identification to the officer's possession would subject him to penalty for violating Florida's traffic laws. See § 322.15, Fla. Stat. (2003) (providing that operating a motor vehicle without a license in one's "immediate possession" is a traffic infraction).[10] Thus, theoretically, retention of Golphin's identification would not have constrained his ability to either request the return of the identification or simply end the encounter by walking into the apartment in which he was staying. See De La Rosa, 922 F.2d at 678; Jordan, 958 F.2d at 1088. Additionally, although there is nothing in the factual record establishing with absolute certainty the manner in which Officer Doemer conducted the warrants check, the record does show that she did not remove herself from the immediate vicinity of Golphin, and indeed continued to talk with him throughout the course of the warrants check. There is no contention that the officer took possession of Golphin's identification and separated herself from the location by returning to the police cruiser and closing the door behind her to conduct a warrants check, thereby effectively foreclosing his ability to request the return of his identification so that he could proceed on his way. Cf. Analla, 975 F.2d at 124.
It must also be considered that Officer Doemer did not retain Golphin's identification while seeking consent to search his person or effects. While "search" and "seizure" are most certainly distinct concepts, retention of identification prior to seeking consent to conduct a search has factored into the analysis in some cases in which it has been determined that the entire encounter was nonconsensual. See Jordan, 958 F.2d at 1088 (determining that the police officers' inhibition of Jordan's desire to exit the bus terminal parking lot by retaining his driver's license combined with the fact that the police continued to retain his license when they asked permission to search his tote bag "pushes his case over the line"); see also United States v. Glover, 957 F.2d 1004, 1009 (2d Cir.1992) (determining that a seizure occurred when government agent requested defendant to proceed to security office for further questioning without returning defendant's identification *1189 and without telling defendant that he was free to leave); Smith v. State, 753 So.2d 713, 717 (Fla. 2d DCA 2000) (Altenbernd, A.C.J., concurring) ("I place considerable importance on the fact that the officer took Mr. Smith's cigarettes and money away from him and did not ask to perform an oral cavity search until he had possession of this property. Most reasonable people would not feel free to walk away from an officer who had their money."); Barna v. State, 636 So.2d 571, 572 (Fla. 4th DCA 1994) (holding that contact was an unlawful investigatory stop where police officers informed the defendant that they were "investigating" due to his presence and that of a companion in a parking lot known for criminal activity and retained his identification to conduct a computer check during which he consented to a search for drugs and weapons). Such a factor is absent in the present case.
While we approve the decision of the district court below, our decision today does not stand for an absolute, expansive proposition that retaining identification for the purpose of conducting a warrants check could never implicate constitutional safeguards. Certainly, we can conceive of circumstances where the retention of identification for the purpose of running a warrants check or other purposes, when viewed in the totality of the circumstances, might implicate the Fourth Amendment.
We are also mindful of decisions from other jurisdictions in which courts have determined that retention of identification for the purposes of conducting a warrants check elevates an otherwise consensual encounter into an investigatory stop and, in so doing, have highlighted serious concerns that may signal a growing disconnect between the evolution of the reasonable person standard and the realities of modern society. The Supreme Court of Tennessee spoke to this point in State v. Daniel, 12 S.W.3d 420 (Tenn.2000), where it held:
[W]hat begins as a consensual police-citizen encounter may mature into a seizure of the person. While many of the circumstances in this case point in the direction of a consensual police-citizen encounter, one circumstance reflects a distinct departure from the typical consensual encounterOfficer Wright's retention of Daniel's identification to run a computer warrants check. Without his identification, Daniel was effectively immobilized. Abandoning one's identification is simply not a practical or realistic option for a reasonable person in modern society. Royer, 460 U.S. at 501-02, 103 S.Ct. at 1326; United States v. Jordan, 958 F.2d 1085, 1087 (D.C.Cir.1992). Contrary to the State's assertion, when an officer retains a person's identification for the purpose of running a computer check for outstanding warrants, no reasonable person would believe that he or she could simply terminate the encounter by asking the officer to return the identification. Accordingly, we hold that a seizure within the meaning of the Fourth Amendment and Article 1, section 7 occurred when Officer Wright retained Daniel's identification to run a computer warrants check.
Id. at 427; see also Piggott v. Commonwealth, 34 Va.App. 45, 537 S.E.2d 618, 619 (2000) ("By retaining Piggott's identification, Detective Langford implicitly commanded Piggott to stay."); State v. Thomas, 91 Wash.App. 195, 955 P.2d 420, 423 (1998) ("Once an officer retains the suspect's identification or driver's license and takes it with him to conduct a warrants check, a seizure within the meaning of the Fourth Amendment has occurred."). Certainly, the dangers posed by crimes such as identity theft and the ever-present threats to our national security make the act of identifying oneself through presentation *1190 of valid, government-issued identification a necessary part of a panoply of human endeavors, from cashing a check to boarding an airplane. Thus, the notion that a "reasonable person" would feel free to end his encounter with the police and risk abandoning his identification is somewhat vulnerable to honest intellectual challenge and discourse. However, by Florida constitutional mandate we are not free to follow the interpretive path of those other states and must be firmly tied to the interpretive construct of our United States Supreme Court decisions.
We recognize that the detailed review of federal Fourth Amendment jurisprudence from the United States Supreme Court that has occasioned our consideration of the instant matter leads to the inexorable conclusion that the hypothetical "reasonable person" carries a heavy, and at times perhaps even an intellectually debatable undue burden, in ensuring his or her individual liberties. In interpreting the scope of the Fourth Amendment, courts appear to have steadily increased expectations that the "reasonable person" is one who not only knows the full extent of his rights, but zealously protects them to the point that he will not hesitate to confront authority and demand the return of identification so that he may effect his right to walk away. Accordingly, one may reasonably inquire whether the "reasonable person" standard has in reality become the "reasonable person trained in the law" standard. Indeed, if reasonable members of the public were asked whether they believed that they could terminate an encounter with a law enforcement officer by simply insisting that the officer return their license or identification, we suggest most would respond in the negative. It is not unreasonable to think that only those versed in search and seizure law may fully understand that the ability of an officer to conduct an identification check is totally contingent upon the civilian's consent to the encounter where no reasonable suspicion of wrongdoing exists.
However, even in light of such legitimate concerns, the reasoning and result reached by the trial court and district court below are well supported by the totality of the facts of the instant matter and in accordance with the appropriate totality of the circumstances analysis and approach. The decisions likewise reflect the considerations addressed by numerous federal courts in applying the reasonable person standard to similar factual scenarios and the decisions of our High Court. Finally, we note that district courts in this state have considered cases analogous to this and have reached similar outcomes. See State v. Robinson, 740 So.2d 9 (Fla. 1st DCA 1999) (determining that police officer's contact with Robinson, which included the officer retaining Robinson's identification for the purpose of running a warrants check, constituted nothing more than a routine police-citizen consensual encounter); State v. Chang, 668 So.2d 207 (Fla. 1st DCA 1996) (concluding that running a warrants check on the identification of a man standing in front of a house known for drug trafficking in the company of another man who discarded a manila envelope constituted a consensual encounter between a police officer and a citizen). In summary, having considered the totality of the circumstances, we hold that the interaction between Golphin and Officer Doemer constituted a consensual encounter. Therefore, Fourth Amendment constitutional safeguards were not implicated when Officer Doemer utilized the identification that Golphin voluntarily provided to check for outstanding warrants.

THE APPLICATION OF STATE v. FRIERSON

In addition to the foregoing conclusion that the encounter was consensual, *1191 we further hold that even if the encounter had constituted a seizure, suppression of the evidence discovered during the search of Golphin would not have been required. The United States Supreme Court has stated that not "all evidence is `fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police." Wong Sun v. United States, 371 U.S. 471, 487-88, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Rather, the High Court has concluded that in such a situation, the issue to be determined is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Id. at 488, 83 S.Ct. 407. In State v. Frierson, 926 So.2d 1139 (Fla.2006), we held that "[t]o properly undertake the inquiry mandated by Wong Sun, we must consider three factors: `(1) the time elapsed between the illegality and the acquisition of the evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct.'" Id. at 1143 (quoting United States v. Green, 111 F.3d 515, 521 (7th Cir.1997), wherein the United States Circuit Court of Appeals for the Seventh Circuit relied on the factors explicitly noted in Brown v. Illinois, 422 U.S. 590, 603-04, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975)).
In Frierson, an officer stopped Frierson's vehicle for a cracked taillight and failure to use a turn signal. See id. at 1141. A subsequent identification check indicated that there was an outstanding warrant in Frierson's name. See id.[11] The search incident to arrest revealed a firearm, and Frierson was charged with being a convicted felon in possession of a firearm. See id. We applied the factors announced in Green and ultimately concluded that the firearm did not need to be suppressed even though the initial stop of Frierson was invalid:
The brief amount of time that elapsed between the illegal stop and the arrest of respondent weighs against finding the search attenuated, but this factor is not dispositive. In turning to the next factor, the outstanding arrest warrant was an intervening circumstance that weighs in favor of the firearm found in a search incident to the outstanding arrest warrant being sufficiently distinguishable from the illegal stop to be purged of the "primary taint" of the illegal stop. Crucially, the search was incident to the outstanding warrant and not incident to the illegal stop. The outstanding arrest warrant was a judicial order directing the arrest of respondent whenever the respondent was located. As Judge Gross noted, "A warrant indicates the existence of criminal conduct separate from the conduct that occurred at the time of the illegal traffic stop." The illegality of the stop does not affect the continuing required enforcement of the court's order that respondent be arrested.
We believe to be very significant the third factor in the Brown analysis, which is whether the purpose and flagrancy of the official misconduct in making the illegal stop outweighs the intervening cause of the outstanding arrest warrant so that the taint of the illegal stop is so onerous that any evidence discovered following the stop must be suppressed. In this case, we do not find that the purpose and flagrancy of misconduct in *1192 illegally stopping respondent was such that the taint of the illegal stop required that the evidence seized incident to the outstanding arrest warrant should be suppressed. The law enforcement officer made a mistake in respect to the enforcement of the traffic law, but there was no evidence that the stop was pretextual or in bad faith.
Id. at 1144-45 (citation omitted).
The application of the three-part test announced in Frierson to the facts of the instant case compels the conclusion that, even if Golphin was seized when Officer Doemer retained the identification which Golphin voluntarily provided, the evidence discovered as a result of the subsequent search would not need to be suppressed. Although it appears from the record that only a brief period of time elapsed between the initial encounter with Golphin and the discovery of the drugs and paraphernalia (a factor that weighs against finding the search attenuated), the warrant that was discovered by Officer Doemer constituted "a judicial order directing the arrest of [the defendant] wherever [he] was located." Id. at 1144. Upon discovery of the warrant, Officer Doemer had an indisputable obligation to enforce that court order. Accordingly, it is evident under these facts that the search was incident to the arrest, not to the preceding encounter between Golphin and Officer Doemer. We further note that the United States Supreme Court has held that searches incident to a lawful arrest are constitutionally permissible and reasonable under the Fourth Amendment. See United States v. Robinson, 414 U.S. 218, 235, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973) ("It is the fact of the lawful arrest which establishes the authority to search, and we hold that in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a `reasonable' search under that Amendment.").
With regard to the third prong of the Frierson analysis, we conclude that even if a seizure of Golphin had occurred, the officers' misconduct did not "outweigh[] the intervening cause of the outstanding arrest warrant so that the taint of the illegal stop is so onerous that any evidence discovered following the stop must be suppressed." 926 So.2d at 1144. In denying Golphin's motion to suppress, the trial court found:
It is clear that the main officer that dealt with Mr. Golphin was Officer Doemer, who testified that there were no lights, no sirens, no weapons drawn, the defendant was not instructed to stop, and also indicated the casual conversation, hey, guy, what's up, what are you doing here, do you live here, asking for identification and the identification being freely produced.
Moreover, during the suppression hearing, Officer Deschamps testified that she and Officer Doemer had been dispatched to conduct field interviews while patrolling the Ridgewood area of Daytona Beach. Thus, it was part of the officers' official duties that night to approach individuals, speak with them, and attempt to obtain information about them, and there is no evidence to indicate that the officers were operating with any malice or bad faith when they approached Golphin. Indeed, the officers' conduct in approaching Golphin (a pedestrian) and retaining his identification was no more, and quite possibly was less, egregious than the conduct of the officers in Frierson, who stopped an automobile for invalid reasons and then retained the defendant's driver's license to check for outstanding warrants. We conclude that whatever official misconduct occurred in the instant case was neither purposeful nor flagrant. Therefore, the *1193 third prong of the Frierson analysis would not compel suppression of the evidence discovered during the search of Golphin. See 926 So.2d at 1144.
In light of the foregoing, we conclude that even if a seizure had occurred in the instant case, suppression of the evidence discovered during the subsequent search of Golphin was not required because the search was incident to his arrest on the outstanding warrant, and there was no evidence of bad faith on the part of the officers. See id. at 1143.

CONCLUSION
For the foregoing reasons, we hold that that in light of the totality of the circumstances presented in this case, Golphin's encounter with police was consensual, and this otherwise consensual encounter did not mature into a seizure simply because the police retained Golphin's identification which he had consensually and voluntarily produced for the purpose of conducting the computerized check for warrants in his presence at that location. The discovery of Golphin's outstanding arrest warrant, arrest, and subsequent search incident to that arrest were not the fruits of an illicit seizure. We therefore approve the decision of the Fifth District below which affirmed the trial court's denial of Golphin's motion to suppress.
It is so ordered.
LEWIS, C.J., and WELLS and BELL, JJ., concur.
CANTERO, J., specially concurs with an opinion, in which WELLS, J., concurs.
PARIENTE, J., concurs in result only with an opinion, in which ANSTEAD and QUINCE, JJ., concur.
CANTERO, J., specially concurring.
I agree with the majority that the totality of the circumstances in this case demonstrate that Golphin was not seized when a police officer held his identification and conducted a brief check for outstanding warrants. I also agree with the majority's application of our recent decision in State v. Frierson, 926 So.2d 1139 (Fla.2006), and its conclusion that, even if the encounter in this case constituted a seizure, suppression of the evidence discovered during the search was not required. I write separately because, unlike the majority, I believe that our conclusion that Golphin was not seized finds strong precedential support in Lightbourne v. State, 438 So.2d 380 (Fla. 1983), cert. denied, 465 U.S. 1051, 104 S.Ct. 1330, 79 L.Ed.2d 725 (1984). The district court in this case, in holding that the defendant consented to the encounter with the police and voluntarily relinquished his identification, cited Lightbourne as "controlling." Golphin v. State, 838 So.2d 705, 706 & n. 2 (Fla. 5th DCA 2003). I agree. In that case, under similar circumstances, we held that a defendant was not seized when he voluntarily relinquished his identification to a police officer who approached his parked car.
In the analysis that follows, I(A) summarize Lightbourne, and (B) explain how similar the circumstances are to those in this case.

A. Lightbourne

In Lightbourne, a police officer approached a parked car that was brought to his attention through "a citizen complaint, motivated by a concern that the [occupant] might be in need of assistance." 438 So.2d at 388. The officer found the defendant sitting awake in the car. After asking a few questions, the officer requested identification, which the defendant voluntarily relinquished. While the defendant remained inside his car, the officer took the *1194 license to his patrol car to check for outstanding warrants. Upon returning to the defendant's car, observing the defendant's "furtive movements and nervous appearance," the officer removed him from the car and searched him for weapons. Id. at 388-89.
The defendant claimed he had been unreasonably seized in violation of his Fourth Amendment rights. Although we acknowledged that when the officer approached the defendant he "had no probable cause or well-founded suspicion that the defendant was about to commit or had committed any crime," id. at 387, we held that the defendant consented to the identification check, which meant that "no showing of founded suspicion was required to justify the encounter." Id. at 388 (citing State v. Rawlings, 391 So.2d 269 (Fla. 4th DCA 1981)). We reasoned as follows:
Officer McGowan's investigation of the suspicious vehicle in this case does not rise to the level of an unconstitutional stop or seizure. Officer McGowan simply approached the parked car, asked defendant a few simple questions as to the reason for his presence there, his current address, and then ran a routine check on the defendant's car and identification. Surely the average, reasonable person, under similar circumstances, would not find the officer's actions unduly harsh. There is nothing in the record that would indicate that prior to defendant voluntarily relinquishing his driver's license to Officer McGowan he was not free to express an alternative wish to go on his way.
Id. at 387-88. We quoted a district court opinion holding that "mere contact between a citizen and a police officer which evokes voluntary cooperation on the part of the citizen is not a `seizure' within the meaning of the Fourth Amendment." Id. at 388 (quoting Rawlings, 391 So.2d at 270) (emphasis added). We then held that "no `stop' or `seizure' of the defendant within the meaning of Terry and its progeny occurred prior to [the defendant's] removal from the car . . . to conduct the pat-down search." Id. at 388. Thus, Lightbourne was based on the voluntary nature of the encounter. We unambiguously held that the defendant was not seized when the officer checked the defendant's identification in his patrol car while the defendant waited in his car.[12]
Because the encounter in Lightbourne began with an officer "investigating a suspicious car" and eventually matured to the point where the defendant was removed from the car based on his "furtive movements and nervous appearance," id. at 387-88, some courts have interpreted that case as one resting entirely on reasonable suspicion. See State v. Taylor, 826 So.2d 399, 405 n. 8 (Fla. 3d DCA 2002) (suggesting that Lightbourne "involve[d] an officer responding to a call about suspicious or criminal activity that, when coupled with the officer's observations, could create the requisite degree of reasonable suspicion"); Baez v. State, 814 So.2d 1149, 1152 & n. 1 (Fla. 4th DCA 2002) (distinguishing *1195 Lightbourne as a case involving a "suspicious activity" rather than consent, but conceding that "we may be wrong in our interpretation"), quashed, 894 So.2d 115 (Fla.2004). Most courts, however, recognizing that the initial encounter, and the relinquishment of the license, were consensual, have interpreted it as a consent case. See, e.g., Chappell v. State, 838 So.2d 645, 647 (Fla. 5th DCA 2003) (holding under Lightbourne that "the officers asking Chappell for identification and running a check did not change the encounter into a detention"); State v. Chang, 668 So.2d 207, 209 (Fla. 1st DCA 1996) (holding under Lightbourne that an officer's "asking for identification, receiving Chang's driver's license, and running a check for warrants" was "nothing more than a consensual encounter").[13] I agree that this is the correct interpretation. The encounter with police, and specifically the relinquishment of identification, were consensual.

B. Applying Lightbourne

The circumstances of this case are similar. The defendant was standing on a sidewalk among a group of men. When police officers approached, some of them walked away. The defendant stayed. One of the officers asked for his identification, which he relinquished. The officer then ran a warrants check, "which took no more than a couple of minutes." Golphin, 838 So.2d at 706. While waiting for the results, the defendant warned the officer "that he had a history of arrests and that he probably had an `open warrant.'" Id. He was rightand was arrested. Now he claims that the identification check constituted an unreasonable seizure in violation of his Fourth Amendment rights.
While I recognize that "in order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter" rather than rely on per se rules, Florida v. Bostick, 501 U.S. 429, 439, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991), the circumstances in this case are so similar to those in Lightbourne that we could not hold in the defendant's favor without either receding from that case or creating an inconsistency in the law. In fact, in Lightbourne the officer's conduct came closer to a Fourth Amendment violation than the conduct at issue here. There, the officer returned to his patrol car to check for warrants, whereas in this case the officer "apparently without moving away [from Golphin] simply commenced a computer check for outstanding warrants." Majority op. at 1178. The check lasted only two minutes, during which Golphin spoke with the officer. Moreover, because Golphin was standing on the street instead of driving a car, he could have walked away without his identification, thus feeling more freedom to end the encounter than the defendant in Lightbourne, who needed his license to drive away lawfully. Under the totality of the circumstances, therefore, the encounter in this case was even less coercive than the one in Lightbourne. A holding that this defendant was seized while the defendant in Lightbourne was *1196 not would create confusion and inconsistency in our Fourth Amendment law.
Although the United States Supreme Court has explained that "a totality of the circumstances approach may render appellate review less circumscribed by precedent than otherwise," United States v. Arvizu, 534 U.S. 266, 276, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002), some degree of deference to relevant precedent remains prudent. We have an obligation not only to the lower courts, but also to Florida citizens and law enforcement officers to maintain consistency and predictability in our Fourth Amendment jurisprudence. While every police encounter will involve slightly different circumstances, not every difference is constitutionally significant.

C. Conclusion
Unlike either the majority, see majority op. at 1179 n. 2; or the concur-in-result only op. at 1198 (Pariente, J.), I believe that our decision in Lightbourne controls the outcome, or at least, given the similarity of the circumstances, that it has great persuasive force. We should rely on Lightbourne in rejecting Golphin's Fourth Amendment claim.
WELLS, J., concurs.
PARIENTE, J., concurring in result only.
I agree with the majority that the evidence need not be suppressed. The majority addresses two issues: whether Golphin was illegally detained and, if so, whether our recent decision in State v. Frierson, 926 So.2d 1139 (Fla.2006), controls. I concur in result only because I disagree with the majority's conclusion that this was a consensual encounter. Once the officer retained Golphin's identification to run a warrants check, Golphin was unlawfully detained in violation of the Fourth Amendment. Nevertheless, because of the existence of the outstanding warrant and no evidence of bad faith on the part of law enforcement, Frierson controls.[14]
Golphin was lawfully on the street, exhibiting no behavior justifying detention, when he was approached by an officer and asked for identification. When the officer retained the identification to conduct a warrants check, a reasonable person in Golphin's position would not have felt free to request the return of his identification or to walk away from the officer without identification in hand. I conclude that when the officer unilaterally retained Golphin's identification in order to conduct a warrants check, the consensual encounter became a detention. Because there was no reasonable, founded suspicion to detain Golphin pending the outcome of the warrants check, Golphin was subjected to an unlawful Fourth Amendment seizure.
Initially, I note that the majority wisely declines to hold as a matter of law that whenever a citizen voluntarily relinquishes his or her identification card to a police officer, the officer may retain it to conduct a warrants check without triggering the protections of the Fourth Amendment. That holding would be inconsistent with Florida v. Royer, 460 U.S. 491, 503, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), in which agents' act of retaining an airline passenger's driver's license and ticket contributed to the Court's conclusion that the person was in effect under arrest for purposes of determining whether the consent to search was voluntary. Rather, the Court's determination today that no detention occurred is fact specific, relying on the totality of the circumstances including the officer's act of retaining Golphin's identification card.[15]
*1197 As stated in United States v. Jordan, 958 F.2d 1085, 1087 (D.C.Cir.1992), the totality of the circumstances test "does not mean that each and every circumstance in the case must be assumed to have the same degree of relevance and weight." There are times when one circumstance among the totality converts what would otherwise be a consensual encounter into a detention. Here the officer testified that she held Golphin's identification "while teletype had his name," and in fact never returned the identification because the warrants check resulted in Golphin being taken into custody. When an identification is retained under those circumstances, no reasonable person would believe that he or she could simply terminate the encounter by asking the officer to return the government-issued identification or by walking away without having regained possession of this important document.
Our assessment of whether Golphin was seized when the officer retained his identification is guided by United States Supreme Court precedent. The majority discusses that Court's decisions concerning searches of bus and airline passengers, as well as cases focusing on the authority of police officers to demand identification from individuals who have been detained. As noted above, in Royer the officers retained the driver's license and ticket of the airline passenger defendant, which along with other circumstances led the Court to conclude that consent to search was obtained during a de facto arrest without probable cause, making its fruits inadmissible. See 460 U.S. at 504, 103 S.Ct. 1319 ("[B]y returning his ticket and driver's license, and informing him that he was free to go if he so desired, the officers may have obviated any claim that the encounter was anything but a consensual matter from start to finish."). The Court distinguished United States v. Mendenhall, 446 U.S. 544, 558, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), in which it upheld a consent search during an encounter in which officers examined and returned another airline passenger's license and ticket. See Royer, 460 U.S. at 504 n. 9, 103 S.Ct. 1319 ("The case before us differs in important respects. Here, Royer's ticket and identification remained in the possession of the officers throughout the encounter; the officers also seized and had possession of his luggage."). In Florida v. Bostick, 501 U.S. 429, 431, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991), the Court approved the admission of evidence obtained in a search of a bus passenger pursuant to consent after the passenger's identification and ticket were "were immediately returned to him as unremarkable."
In each of those cases, the Court took into account whether officers kept or returned the defendant's identification in assessing whether, under the totality of the circumstances, the defendant had been detained. Although the Court did not assign any particular weight to this circumstance, I believe it is critical in this case because of the necessity of having government-issued identification to navigate contemporary American life. The use of government-issued photo identification has only grown in the years since Bostick, Royer, and Mendenhall were decided. As one commentator has noted, the state driver's license is
the most commonly requested form of verification in industries ranging from banks, to nightclubs and liquor stores, to trains, planes, and rental cars. In fact, *1198 it would be difficult to cash checks, enter secured areas, or even purchase alcohol without a driver's license. In this way, it has become the form of identification upon which Americans most often depend.
Neda Matar, Are You Ready for a National ID Card? Perhaps We Don't Have to Choose Between Fear of Terrorism and Need for Privacy, 17 Emory Int'l L.Rev. 287, 321 (2003); see also María Pabón López, More Than a License to Drive: State Restrictions on the Use of Driver's Licenses by Noncitizens, 29 S. Ill. U.L.J. 91, 109 (2004-2005) (noting that drivers' licenses are now used for many purposes "tied to verifying identityfrom obtaining a library card to cashing a check").[16]
Because this case does not concern a request that a defendant already under detention identify himself, the line of United States Supreme Court cases concerning requests for identification under "stop and identify" statutes is not controlling here. See Hiibel v. Sixth Judicial District Court of Nevada, 542 U.S. 177, 124 S.Ct. 2451, 159 L.Ed.2d 292 (2004); Kolender v. Lawson, 461 U.S. 352, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983); Brown v. Texas, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979). Florida has a similar statute authorizing officers to ascertain a person's identity during a lawful detention, see section 901.151(2), Florida Statutes (2006), but it is not implicated in this case because there was no reasonable, articulable suspicion of criminal activity. Thus, we are not precluded from considering decisions from other jurisdictions by the conformity clause in article I, section 12 of the Florida Constitution, which requires that constitutional search-and-seizure issues be decided in accord with United Statutes Supreme Court precedent construing the Fourth Amendment. See art. I, § 12, Fla. Const.
Further, as the majority recognizes, neither our plurality decision in State v. Baez, 894 So.2d 115 (Fla.2004), nor the Court's decision in Lightbourne v. State, 438 So.2d 380 (Fla.1983), controls here. See majority op. at 1179 n. 2. Baez involved suspicious circumstances not present in this case. See 894 So.2d at 117 (holding that where defendant was found slumped over wheel of his van in a dimly lit warehouse area at night, officer "had sufficient cause to further investigate by conducting a computer check based on Baez's suspicious behavior"). Lightbourne focused on whether the defendant was detained at the point that he gave the police officer his driver's license, which is not the issue here. See 438 So.2d at 388 ("There is nothing in the record that would indicate that prior to defendant voluntarily relinquishing his driver's license to Officer McGowan he was not free to express an alternative wish to go on his way.").[17] *1199 Thus, the issue we address in this case, whether a pedestrian in a public area is detained when a police officer retains his or her license for a warrants check, is not governed by any applicable precedent from this Court.
Appellate courts in other jurisdictions that have faced this issue under similar facts have held that retaining an individual's identification for a warrants check transforms a street encounter into a detention. In State v. Daniel, 12 S.W.3d 420, 428 (Tenn.2000), the Tennessee Supreme Court, applying the Fourth Amendment's totality-of-the-circumstances test, so held without addressing whether the officer left the defendant's presence to run the warrants check. The court directly addressed the dilemma faced by individuals placed in this situation:
[W]hat begins as a consensual police-citizen encounter may mature into a seizure of the person. While many of the circumstances in this case point in the direction of a consensual police-citizen encounter, one circumstance reflects a distinct departure from the typical consensual encounterOfficer Wright's retention of Daniel's identification to run a computer warrants check. Without his identification, Daniel was effectively immobilized. Abandoning one's identification is simply not a practical or realistic option for a reasonable person in modern society. Contrary to the State's assertion, when an officer retains a person's identification for the purpose of running a computer check for outstanding warrants, no reasonable person would believe that he or she could simply terminate the encounter by asking the officer to return the identification.
12 S.W.3d at 427 (citations omitted).
In People v. Mitchell, 355 Ill.App.3d 1030, 291 Ill.Dec. 786, 824 N.E.2d 642, 644, appeal denied, 215 Ill.2d 611, 295 Ill.Dec. 525, 833 N.E.2d 7 (2005), the officer took the license he had obtained from the defendant in a street encounter to his police car to run a warrants check. The appellate court concluded that "a reasonable person in Mitchell's position would not have felt free to approach the squad car, knock on the window, and demand the immediate return of his identification. A reasonable person would have stood right where the police had left him and waited for them to return his identification." Id. at 647. Similarly, in Salt Lake City v. Ray, 998 P.2d 274, 276 (Utah Ct.App.2000), an officer requested identification during an encounter with the defendant outside a convenience store and then stepped away from her to conduct the warrants check on a portable radio. The appellate court held that in moving away from the defendant while retaining the license, the officer escalated a permissive encounter into a detention without a reasonable suspicion of criminal activity. See id. at 278-81; see also State v. Markland, 112 P.3d 507 (Utah 2005) (assuming that officer's act of retaining defendant's license for warrants check during street encounter resulted in a detention); Commonwealth v. Morton, No. 0497-00-2, 2000 WL 949489, at *5 (Va.Ct. App. July 11, 2000) (holding that officer who asked for and received identification card and stuck it in his belt while continuing investigation detained defendant).
*1200 Courts have also found that defendants encountered in or around parked cars, and passengers encountered during traffic stops, were detained when officers retained their licenses to conduct warrants checks. See United States v. Chan-Jimenez, 125 F.3d 1324, 1326 (9th Cir.1997) (holding that officer who received identification and registration of driver of truck pulled to roadside with hood raised seized defendant within the meaning of the Fourth Amendment when he asked to look in bed of truck without returning documents); Piggott v. Commonwealth, 34 Va. App. 45, 537 S.E.2d 618, 619 (2000) (holding that by retaining identification of automobile passenger during warrants check, officer detained defendant); State v. Thomas, 91 Wash.App. 195, 955 P.2d 420, 423 (1998) (concluding that when officer took license of defendant sitting in parked car to the rear of the car to conduct a warrants check, "a seizure within the meaning of the Fourth Amendment . . . occurred"). In all of these cases, the courts grounded their decisions in the Fourth Amendment's guarantee against unreasonable searches and seizures, including the distinction between consensual encounters and detentions as well as the totality of the circumstances test for determining whether the defendant was detained.
In accord with the out of state precedent, as well as the Fourth District Court of Appeal decision in Perko v. State, 874 So.2d 666, 667 (Fla. 4th DCA 2004), dismissed as moot, 894 So.2d 972 (Fla.2005), I conclude that Golphin was seized within the meaning of the Fourth Amendment when the officer retained his license to call in a warrants check on her portable radio. In Perko, the district court ruled that the fruits of a consent search obtained while an officer was holding Perko's driver's license for a warrants check were inadmissible. See 874 So.2d at 666-67. Although the Fourth District relied in part on its decision in Baez, which was later overturned by this Court, Perko is distinguishable from Baez because it lacks any mention of suspicious circumstances justifying investigative detention.
Under analogous circumstances, we have found a Fourth Amendment violation where a law enforcement officer extended a traffic stop past the point that reasonable suspicion dissolves by then obtaining additional information that led to the driver's arrest. See State v. Diaz, 850 So.2d 435, 439-40 (Fla.2003). We relied on precedent holding that after the legitimate purpose of a traffic stop has been accomplished, an officer may not extend the detention by obtaining the driver's license and registration. See id. at 439. Consistent with Diaz, we should not allow a law enforcement officer to transform a consensual street encounter into a detention by retaining an identification for the same purpose. In ruling to the contrary, we are sending the confusing message to law enforcement officers that they may conduct nearly unconstrained warrants checks on pedestrians but are precluded from conducting suspicionless license checks on motorists.
The majority acknowledges Diaz and recognizes that "the exhibition of unqualified police discretion in the context of a consensual encounter is likewise troublesome." Majority op. at 1183 n. 7. But in reaching a conclusion that I consider inconsistent with Diaz, the majority places too much reliance on the fact that the officer never left Golphin's company during the warrants check. Although relevant, this fact does not change the conclusion that no reasonable person would believe he is free to leave when the police retain government-issued identification. The difficulty in securing the return of an identification from an officer who has retreated *1201 to a closed police vehicle may contribute to the defendant's sense of being detained, see, e.g., Mitchell, Thomas, but so too might the officer's act of remaining in the defendant's presence, which might have discouraged the defendant from believing he could simply walk away unchallenged. Contrary to the conclusion of the Fourth Circuit in United States v. Analla, 975 F.2d 119, 124 (4th Cir.1992), on which the majority relies, no reasonable person would feel free to ask for the return of an identification card from an officer almost immediately after surrendering it, regardless of whether the officer is next to the defendant or twenty feet away in a patrol car.[18] As stated in Piggott, an officer's act of retaining an individual's license is an "implicit[ ] command[ ] . . . to stay." 537 S.E.2d at 619.
Further, the answer to the question whether Golphin was detained should not turn on whether he was about to engage in an activity for which he might need his identification. Rather, in determining whether a consensual encounter has become a detention, the issue is whether the individual is constrained in exercising his freedom of movement or association. See Terry v. Ohio, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (stating that a seizure occurs when an officer "has in some way restrained the liberty of a citizen"). In a society in which official identification is necessary for a myriad of activities, the defendant should not have to establish that he or she will need the license or identification immediately following the encounter with police.
Regarding the assertion that Golphin could simply have walked into the apartment where he was staying, there is no testimony that he was prepared to retire for the evening and no indication how his identification might have been returned to him if he had departed the scene.[19] Like the notion that an individual feels free to request the return of identification relinquished to police, the suggestion that an individual feels free to simply walk away from a police officer who has the person's identification and is attempting to ascertain if grounds exist to arrest the person for past conduct is a fiction divorced from the realities of everyday life. The defendant's failure to request the return of his identification under these circumstances is no more than acquiescence to the officer's authority. Certainly, no reasonable person would feel free to leave while a police officer holds his or her identification.
The majority accurately acknowledges the "growing disconnect between the evolution of the reasonable person standard and the realities of modern society," but I respectfully suggest that its holding perpetuates that disconnect. I cannot reconcile the Court's recognition that "presentation of government-issued identification [is] a necessary part of human endeavors" with its assertion that Golphin could "either request the return of his identification or simply end the encounter by walking into the apartment in which he was staying." *1202 The Fifth District Court of Appeal also stated that Golphin could request the return of his license, leading Judge Klein of the Fourth District to make the following response in Perko:
Our sister court, which upheld a search under these circumstances, did so under the assumption that a person can "withdraw his consent at any time by, for example, asking that his license be immediately returned." Golphin v. State, 838 So.2d 705, 707 (Fla. 5th DCA 2003). This, of course, presupposes that the person knows the law of search and seizure. I, for one, despite my law school education, had no idea there was such a thing as a consensual encounter until I became a judge. Because police officers are, in our society, charged with maintaining order and enforcing the law, it would never have occurred to me that I could insist on the return of my license before the officer was finished with it. Nor would it occur to any other person unversed in search and seizure law.
As Professor LaFave has written "[i]t is nothing more than fiction to say that all of these subjects have consented to the confrontation." Wayne R. LaFave, Search and SeizureA Treatise on the Fourth Amendment § 9.3(a), at 95-96 (3d ed.1996).
874 So.2d at 667 (Klein, J., concurring specially) (alteration in original).
Therefore, under the totality of the circumstances, and giving due weight to the fact that the officer asked for Golphin's identification and then retained it as a matter of course to conduct a warrants check, I conclude that Golphin was detained without reasonable suspicion of criminal activity. But for our decision in Frierson holding that discovery of an active arrest warrant constitutes an attenuating circumstance that dissipates the taint of the illegal stop under circumstances analogous to this case, I would quash the decision below and remand with directions to reverse the trial court's denial of Golphin's motion to suppress the evidence obtained as a result of this illegal detention.
Finally, this case and others like it cause me grave concern about our freedom as Americans to lawfully move about without attracting the unwanted and coercive attention of the authorities. Evidently, police officers in some jurisdictions view a warrants check as a routine feature of almost any citizen encounter. See, e.g., People v. Bouser, 26 Cal.App.4th 1280, 32 Cal.Rptr.2d 163, 164 (1994) (noting that during consensual encounter, officer used information provided by defendant to run a records check, as was his standard procedure); Mitchell, 291 Ill.Dec. 786, 824 N.E.2d at 644 (noting that officer testified that "whenever he meets someone on the street, he runs a warrant check on that individual"); Wilson v. State, 874 P.2d 215, 222 (Wyo.1994) (noting that officer testified that his department's policy is to conduct national and local warrants checks of everyone police "contact" late at night). This practice essentially forces a citizen who is not reasonably suspected of committing a crime to satisfy a police officer that he or she has a right to walk the streets. What the Court stated in Diaz in addressing the illegal extension of a traffic stop rings equally true here: "It would be dangerous precedent to allow overzealous law enforcement officers to place in peril the principles of a free society by disregarding the protections afforded by the Fourth Amendment." 850 So.2d at 439.[20]
*1203 An independent judiciary exists in large measure to prevent this type of encroachment on our constitutional rights, of which none is more fundamental than the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV. We must not shirk our duty in this regard because in the end each new and seemingly small step we take to accept limited government intrusion into our lives for the sake of safety or security takes us slowly but surely away from our cherished freedoms.
ANSTEAD and QUINCE, JJ., concur.
NOTES
[1] Another panel of judges in the Fourth District has agreed with this analysis and also reached the same conclusion as the panel of judges in Baez. See Perko v. State, 874 So.2d 666, 667 (Fla. 4th DCA 2004) (reversing denial of motion to suppress and determining that Perko was effectively seized when the police retained his identification and received his consent to conduct a search yielding drug evidence); see also Mays v. State, 887 So.2d 402 (Fla. 2d DCA 2004) (noting that the Second District has determined that a brief retention of identification for the purpose of conducting a warrants check constitutes a consensual encounter whereas the Fourth District has determined it is a seizure; comparing Watts v. State, 788 So.2d 1040 (Fla. 2d DCA 2001) (en banc); State v. Mitchell, 638 So.2d 1015 (Fla. 2d DCA 1994); and McLane v. Rose, 537 So.2d 652 (Fla. 2d DCA 1989), with Baez and Perko), notice invoking discretionary jurisdiction filed, No. SC04-2149 (Fla. Nov. 5, 2004). The proceedings in Mays v. State, No. SC04-2149, have been stayed pending the resolution of the instant case.
[2] Our decision quashing the Fourth District's decision in Baez, see State v. Baez, 894 So.2d 115 (Fla.2004), does not control the analysis here. The scenario presented in Baez involved an officer responding to a complaint concerning a van parked at night in an otherwise abandoned warehouse area. See id. at 115. When the officer arrived on scene to investigate, he observed the driver of the vehicle slumped over the steering wheel of the parked van. See id. When awakened, the man exited the van without instruction from the officer. See id. at 116. In light of the factual record, a plurality of this Court determined:

The totality of the circumstances presented demonstrates that . . . the officer did have a reasonable basis and reasonable suspicion to investigate Baez further. Baez was found in a suspicious conditionslumped over the wheel of his vanin a location in which he should not normally have beena dimly lit warehouse area at night. Baez voluntarily exited his vehicle, and when asked for identification, gave his driver's license to the officer. The officer had sufficient cause to further investigate by doing a computer check based on Baez's suspicious behavior. It was not unreasonable for the officer to proceed with the computer check when he had not yet eliminated reasonable concern and justified articulable suspicion of criminal conduct.
Id. at 117. As the quoted language indicates, the plurality tacitly assumed that a seizure occurred under different facts, and focused its consideration on whether the seizure was reasonable and thus constitutional.
The same rationale guided this Court's consideration in Lightbourne v. State, 438 So.2d 380 (Fla.1983), a case in which we determined that no unlawful intrusion had occurred when the police, acting in response to a citizen's complaint regarding a suspicious vehicle, approached Lightbourne's parked car, asked him some simple questions regarding his reason for being there, and ran a "routine check" on his car and identification. Id. at 387. We determined that a well-founded suspicion was not required under the facts of that case because the officers were responding to a call and were not acting on their own "hunch." Id. at 387. The encounter in the instant matter, by contrast, was not initiated on the basis of a citizen complaint or any other "suspicious" circumstance requiring investigation. Thus, neither Baez nor Lightbourne controls the analysis here or compels a particular outcome.
[3] An investigatory stop will not violate a citizen's Fourth Amendment rights if based on "a well-founded, articulable suspicion of criminal activity." Id.
[4] During the course of his encounter with Officer Doemer, Golphin did reveal that he had an open warrant. However, he did so only after she had begun the process of checking for outstanding warrants.
[5] The trial court specifically discredited Golphin's testimony that the police had pulled their cruiser onto the sidewalk in a manner that prevented him from leaving the area. Additionally, there is no evidence that the K-9 unit became actively involved in this scene until the search occurred which followed the arrest.
[6] It was not until submission of his reply brief to this Court that Golphin argued that once Officer Doemer ascertained that the picture on the identification he had provided matched his appearance, she had no legal basis for any further retention of the identification to check for outstanding warrants.
[7] It is axiomatic that if a seizure occurs, the reasonableness requirement of the Fourth Amendment dictates that "[t]he scope of the detention must be carefully tailored to its underlying justification." See Florida v. Royer, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion) (explaining that the reasonableness requirement of the Fourth Amendment is not diluted in the context of warrantless seizures predicated on less than probable cause). As the Royer Court succinctly explained:

[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.
Id. Indeed, it is on this basis that we determined a Fourth Amendment violation had occurred in State v. Diaz, 850 So.2d 435 (Fla. 2003), a case in which we held that Diaz's Fourth Amendment rights were violated when the police officer, who had initiated a traffic stop because he could not read the temporary tag displayed on Diaz's vehicle, continued to detain him and required the production of additional information after ascertaining that the temporary tag was completely valid. See id. at 436, 440. We relied upon Royer and Delaware v. Prouse; 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), for the proposition that once a police officer has satisfied the purpose for which he has initially stopped a motorist, the officer no longer has any reasonable grounds or legal basis for continuing the detention. See Diaz, 850 So.2d at 438. Certainly the exhibition of unqualified police discretion in the context of a consensual encounter is likewise troublesome, and may indicate that a seizure has indeed occurred.
[8] Golphin has asserted before this Court that law enforcement's authority to stop pedestrians and request identification is limited to the context of a Terry stop based upon reasonable articulable suspicion. This assertion has no basis in the law, and Golphin mistakenly invokes Hiibel v. Sixth Judicial District Court of Nevada, 542 U.S. 177, 124 S.Ct. 2451, 159 L.Ed.2d 292 (2004), for support. Hiibel is the latest in a line of cases involving "stop and identify" statutes, which require persons to identify themselves pursuant to law enforcement request. See also Kolender v. Lawson, 461 U.S. 352, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983); Brown v. Texas, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979). In Hiibel, the county sheriff's office received a call reporting that a man was assaulting a woman in a red and silver pickup truck on an identified road. See id. at 180, 124 S.Ct. 2451. A police officer was dispatched and indeed discovered a truck matching that description at the designated location with a woman inside and man standing beside. The officer approached the man, explaining that he was investigating a report of an assault and asking to see identification. Thus, it was in this contexta criminal investigation based on reasonable articulable suspicionthat the High Court held that obtaining a suspect's name in the course of a Terry stop serves important government interests and that a state law requiring a suspect to disclose his name in the course of a valid Terry stop is consistent with the Fourth Amendment prohibition against unreasonable searches and seizures. See id. at 187-88, 124 S.Ct. 2451. The Hiibel Court further recognized that "[i]n the ordinary course a police officer is free to ask a person for identification without implicating the Fourth Amendment." Id. at 185, 124 S.Ct. 2451.
[9] Other federal circuit courts have also considered the status of the individual as a driver or a pedestrian, and even the type of identification involved, in determining whether a seizure has occurred. See United States v. Weaver, 282 F.3d 302 (4th Cir.2002) (distinguishing bright line rule applicable to retention of driver's licenses in the context of traffic stops and noting that Weaver was a pedestrian and could have refused to provide his identification and walked away from the police encounter); United States v. Campbell, 843 F.2d 1089, 1093 (8th Cir.1988) (expressing doubt that retention of a used one-way ticket and a state identification card, as opposed to a driver's license, were significant factors in determining whether a seizure occurred).
[10] At the suppression hearing, Golphin testified that he provided Officer Doemer his state identification card, not a driver's license. The State does not challenge that assertion.
[11] It was later determined that Frierson himself had no outstanding warrants, but "[s]omeone other than the defendant was issued a notice to appear in the other case and wrongfully gave the issuing officer the defendant's name and date of birth." Id.
[12] We recently decided another case involving similar circumstances. See State v. Baez, 894 So.2d 115 (Fla.2004). In that case, an officer approached a van parked near an abandoned warehouse at night, requested the occupant's identification, and took it to his police car to check for outstanding warrants. None of the opinions in Baez, however, garnered a majority. The plurality of three concluded that the officer had reasonable suspicion of criminal activity to justify the identification check. Id. at 117. Justice Wells, who joined the plurality opinion, also filed a concurring opinion, in which Justice Bell concurred, which argued that under Lightbourne the encounter would have been justified as consensual. Id. at 119-20 (Wells, J., concurring).
[13] Additional examples of courts reading Lightbourne as involving consent include Lanier v. State, 936 So.2d 1158 (Fla. 2d DCA 2006); Johnson v. State, 785 So.2d 1224, 1228 (Fla. 4th DCA 2001); State v. Collins, 661 So.2d 962, 964 (Fla. 5th DCA 1995); State v. DeCosey, 596 So.2d 149, 150 (Fla. 2d DCA 1992); State v. Wilson, 566 So.2d 585, 587 (Fla. 2d DCA 1990); Hill v. State, 561 So.2d 1245, 1247 (Fla. 2d DCA 1990); J.C.W. v. State, 545 So.2d 306, 307 (Fla. 1st DCA 1989); Daniels v. State, 543 So.2d 363, 366 n. 3 (Fla. 1st DCA 1989); McLane v. Rose, 537 So.2d 652, 654 (Fla. 2d DCA 1989); State v. Lamb, 484 So.2d 1368, 1369 (Fla. 2d DCA 1986); and Davis v. State, 461 So.2d 1361, 1362-63 (Fla. 2d DCA 1985).
[14] I dissented in Frierson but acknowledge that it controls in this case.
[15] I agree with the majority's determination that because the argument was not made below, we should not address whether Golphin's act of relinquishing his identification constituted consent to the officer retaining the identification for a warrants check.
[16] The societal importance of government-issued photographic identification is underscored by the recent enactment of federal legislation intended to toughen and standardize the requirements for obtaining such identification, as an anti-terrorism measure. See Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Tsunami Relief, 2005, Pub.L. 109-13, div. B, tit. II, § 201-02, 119 Stat. 231, 311-15 (2005).
[17] Because Lightbourne was decided in an earlier stage in the development of our Fourth Amendment jurisprudence and does not accurately reflect the current state of the law, I would go further and recede from it. "The doctrine of stare decisis must bend when there has been a significant change in circumstances since the adoption of the legal rule." Weiand v. State, 732 So.2d 1044, 1055 n. 12 (Fla.1999). I noted in my dissenting opinion in Baez that in its discussion of this issue, one of several in a capital appeal, the Court in Lightbourne did not apply the distinction between consensual encounters and detentions that we later articulated when we focused exclusively on the issue in Popple v. State, 626 So.2d 185, 186-88 (Fla.1993). See Baez, 894 So.2d at 122 (Pariente, C.J., dissenting). The tension between Lightbourne and the law as reflected in our subsequent decision in Popple is reflected in the district courts' inconsistent interpretations of Lightbourne set out in Justice Cantero's specially concurring opinion. Clearly, Lightbourne has become an impediment to clarity and predictability in this state's Fourth Amendment jurisprudence.
[18] I also disagree with the assumption, implicit in Analla, that whenever an officer consensually obtains a defendant's license, the consent necessarily extends to the time needed to conduct a warrants check. See 975 F.2d at 124 ("Parker necessarily had to keep Analla's license and registration for a short time in order to check it with the dispatcher.").
[19] The record is unclear whether Golphin lived near the corner where the encounter with the police occurred. Officers testified that when asked, none of the persons they encountered said they lived in the apartment complex on that corner, but Golphin testified that he was standing in front of the small apartment building where he was staying when encountered by police.
[20] One of the most disturbing features of suspicionless warrants checks is that the intrusion tends to fall disproportionately on particular ethnic and racial groups. A recent study of traffic stop practices of the Miami-Dade Police Department revealed that "Blacks were more likely than Whites or Hispanics to have their vehicles towed, to receive a pat down search, or to have record checks conducted, either on them or their vehicles." The Alpert Group, Miami-Dade Police Department Racial Profiling Study, November 2004 (available at http://www.miamidade.gov/comm/library/MDPD_Racial_Profiling_Study.pdf) at vii (emphasis supplied).