PARIENTE, J.,
specially concurring.
The question in this case is whether police may retain an individual’s identifica *217 tion to run a warrants check when there is no reasonable suspicion of criminal activity. Mays concedes that there is no practical difference between the factual circumstances in his case and those facts presented in our recent decision in Golphin v. State, 945 So.2d 1174 (Fla.2006). I therefore agree that this case is controlled by Golphin, in which a 4-3 majority of this Court concluded that retaining the license of a pedestrian to run a warrants check did not in itself turn a consensual encounter into an unlawful detention. However, I note that because Golphin did not preserve the issue, the majority expressly declined to consider “whether or not Golphin after consensually and voluntarily producing identification specifically consented to Officer Doemer using that identification in his presence to conduct a warrants check or how the lack of any such consent might impact the analysis in this case.” Id. at 1182-83. The majority also recognized that “[cjircumstances may exist in which an officer’s conduct exceeds the scope of consent that reasonably can be implied by the act of handing over one’s identification, and such circumstances may indicate that a seizure has occurred.” Id. at 1183. Accordingly, I reiterate that Golphin does not “hold as a matter of law that whenever a citizen voluntarily relinquishes his or her identification card to a police officer, the officer may retain it to conduct a warrants check without triggering the protections of the Fourth Amendment.” Id. at 1196 (Par-iente, J., concurring in result only).
Indeed, I expressed my view in Golphin that an individual’s consent to provide an officer with identification does not neees-sarily include consent for the officer to retain the identification to run a warrants check. See id. at 1201 n. 18. This is consistent with the United States Supreme Court’s pronouncement that “[i]n the absence of any basis for suspecting [a person] of misconduct, the balance between the public interest and [the] right to personal security and privacy tilts in favor of freedom from police interference.” Brown v. Texas, 443 U.S. 47, 52, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979).
I also reiterate my concern “about our freedom as Americans to lawfully move about without attracting the unwanted and coercive attention of the authorities.” Golphin, 945 So.2d at 1202 (Pariente, J., concurring in result only). Troubling statistics released by the New York City Police Department show that the number of people stopped on the streets in that city increased from 97,296 in 2002 to 508,540 in 2006. See A1 Baker, 6-Month Study to Review “Stop and Frisks” by New York Police, N.Y. Times, March 1, 2007, at Bl.[1] A special report recently released by the Department of Justice shows that 43.5 million United States residents had face-to-face contact with the police in 2005. See Bureau of Justice Statistics, U.S. Dep’t of Justice, Contacts between Police and the Public, 2005 1 (2007).
I remain concerned that little by little we continue to chip away at the protections of the Fourth Amendment that are designed to protect our citizens from unreasonable searches and seizures. This is not a theoretical problem but rather a tangible issue that goes to the core of the *218 constitutional rights we as a country hold so dear.
ANSTEAD and QUINCE, JJ., concur.

. The New York City Police Department has commissioned an independent study of the way it stops people on the street that will focus on the role that race plays in these police-citizen encounters. See id. I previously noted that "[o]ne of the most disturbing features of suspicionless warrants checks is that the intrusion tends to fall disproportionately on particular ethnic and racial groups.” Golphin, 945 So.2d at 1202 n. 20 (Pariente, J., concurring in result only).