BENTON, J.
We are asked to decide whether the trial court erred in ruling that (1) section 63.088(1), Florida Statutes (2007), runs afoul of due process guarantees insofar as it deems unmarried biological fathers on notice that section 63.054, Florida Statutes (2007), requires them to file a claim of paternity with the Florida Putative Father Registry (Registry) in order to protect paternal rights;[1] and in ruling that (2) the Servicemembers Civil Relief Act, 50 U.S.C. app. §§ 501 et seq. (2007) (Act), tolls the time in which unmarried fathers in active military service can, in order to assure their ability to assert their paternal rights in Florida courts, file a claim of paternity with the Registry.[2] We *899 find it unnecessary to resolve either point in order to decide the present case. Without reaching the merits of any constitutional question, we affirm the final order under review.
Appellee C.L.G.’s marriage to ap-pellee A.R.L. dispelled any statutory cloud on C.L.G.’s “fundamental liberty interest ... in the care, custody and management of [his] child.” Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). We “have long subscribed to a principle of judicial restraint by which we avoid considering a constitutional question when the case can be decided on noncon-stitutional grounds.” See In re Holder, 945 So.2d 1180, 1133 (Fla.2006).
A Petty Officer Third Class in the United States Navy, C.L.G. was a “service-member” within the meaning of the Act at all relevant times. After a romantic interlude with A.R.L. in June of 2007, C.L.G. went to sea from July 9 until December 19, 2007. In his absence, A.R.L. resumed a liaison with one K.B. When she learned in December of 2007 that she was pregnant, she told K.B., believing he was the father. Initially, she made no mention of her pregnancy to C.L.G., even when he returned to port, although C.L.G. and A.R.L. spoke by telephone, and twice met in person (before her pregnancy was apparent and) before the baby was born in March of 2008.
After A.R.L. gave birth on March 3, 2008, A.R.L. and K.B. arranged to place the child for adoption with distant relatives, appellants D.P. and L.P. On March 6, 2008, the day after D.P. and L.P. took the newborn to their home in Connecticut, D.P. and L.P. filed a report of intended placement for adoption in the Circuit Court for Duval County. The same day, A.R.L. and K.B. executed affidavits eschewing their parental rights and consenting to the adoption. As of March 11, 2008, when D.P. and L.P. filed a petition to terminate parental rights for subsequent adoption, C.L.G. had filed no claim of paternity with the Registry.
As early as April 7, 2008, A.R.L. began to think more carefully about the chronology of her sexual encounters with K.B. and C.L.G., and to wonder whether C.L.G. could be the father of her child. On April 12, 2008, she first informed C.L.G. that a child had been born, and of the possibility that he was the father. One week later, C.L.G. filed a claim of paternity with the Registry.
On April 30, 2008, C.L.G. filed an emergency petition to determine paternity, seeking expedited action on the petition on grounds he was scheduled to ship out on May 5, 2008. The court declined to treat the matter as an emergency, but consolidated it with the adoption and termination of parental rights proceedings D.P. and L.P. had initiated. Meanwhile, on July 18, 2008, C.L.G. and A.R.L. became husband and wife. Court-ordered DNA testing subsequently revealed a 99.99 percent probability that C.L.G. was the biological father of the child. Thereafter, in the final order under review, the trial court ruled that C.L.G. was the father of the child, and dismissed the petition for termination of parental rights for subsequent adoption.[3]
Implicitly relying on the Supremacy Clause, article VI, clause 2 of the United States Constitution, the trial court held that the Act’s tolling provision excused C.L.G.’s late filing of his claim of paternity with the Registry: The statute provides that “a claim of paternity may not be filed after the date a petition is filed for termi *900 nation of parental rights,” § 63.054(1), Fla. Stat. (2007), which occurred here when the child was only eight days old.
The trial court ruled that the requirement to file a claim of paternity with the Registry, to preserve unwed fathers’ paternal rights, ought to be viewed as a “judicial or administrative proceeding commenced in any court or agency” within the reach of the Act. 50 U.S.C. app. § 512(b) (2007). Compare In re Adoption of J.D.P., 198 P.3d 905, 906-07 (Okla.Civ.App.2008) (holding the Act applicable to an Oklahoma statute requiring no consent to adoption from any parent who neglected to support the child for twelve months, ruling that “the Civil Relief Act tolling provision was applicable and the trial court was prohibited from including any period of Father’s military service in calculating the [statutory] time period[ ]”) with In re Baby Girl, 206 A.D.2d 932, 615 N.Y.S.2d 800, 801-02 (N.Y.App.Div.1994) (holding Act did not toll six-month period unwed father had in which to assure that biological connection with child ripened into constitutionally protected liberty interest).
In addition, the trial court ruled that section 63.088(1) could not be applied constitutionally in C.L.G.’s case, opining that “to find that [C.L.G.] had given up all rights to his child under these circumstances would be a violation of his due process and privacy rights.” In reaching this conclusion, the trial court reasoned that the “right to have a relationship with one’s own child is too important a legal right to forfeit” based on a statutory presumption that unmarried men who engage in sexual relations are on notice of the obligation to file a claim of paternity with the Registry in order to protect their paternal rights.
But the trial court’s rulings overlook the fact that the registration requirement for preservation of paternal rights applies only to an “unmarried biological father.” § 63.054(1), Fla. Stat. (2007). C.L.G. was no longer “unmarried,” when the trial court ruled. Section 63.088(1) ceased to apply to C.L.G. once he married A.R.L. on July 18, 2008, more than eight months before entry of the final order under review. The statute has no effect on a biological father who marries the child’s mother before any purported judicial termination of parental rights. See Cashatt v. State, 873 So.2d 430, 436 (Fla. 1st DCA 2004) (“a statute is to be construed where fairly possible so as to avoid substantial constitutional questions”).
A fortiori, any consequence the Act might have had for section 63.054(1) or 63.088(1) had no bearing on C.L.G.’s rights, once he was married to the child’s mother. Construing any of these statutes as applicable in the present circumstances would raise substantial constitutional questions unjustifiably. Accordingly, we affirm the order under review without endorsing the trial court’s reasoning or its views on any constitutional question. See Robertson v. State, 829 So.2d 901, 906-07 (Fla.2002) (discussing application of the “tipsy coachman” rule).
Once D.P. and L.P. filed a petition for termination of parental rights (on March 11, 2008), C.L.G. lost the statutory right to file a claim of paternity under section 63.054(1). When he married A.R.L., however, his failure to file a timely claim of paternity with the Registry became immaterial, because he was no longer subject to section 63.054(1) or 63.088(1). The parents’ marriage conferred on the child the same status as a child born to a couple with an intact marriage. See § 742.091, Fla. Stat. (2007) (“If the mother of any child born out of wedlock and the reputed father shall at any time after its birth intermarry, the child shall in all respects be deemed and held to be the child of the *901 husband and -wife, as though born within wedlock .... ”).
Affirmed.
KAHN and CLARK, JJ., concur.

. The Florida Putative Father Registry statute provides, in pertinent part:
In order to preserve the right to notice and consent to an adoption under this chapter, an unmarried biological father must, as the "registrant,” file a notarized claim of paternity form with the Florida Putative Father Registry maintained by the Office of Vital Statistics of the Department of Health and shall include therein confirmation of his willingness and intent to support the child for whom paternity is claimed in accordance with state law. The claim of paternity may be Hied at any time prior to the child's birth, but a claim of paternity may not be filed after the date a petition is filed for termination of parental rights. In each proceeding for termination of parental rights, the petitioner shall submit to the Office of Vital Statistics of the Department of Health a copy of the petition for termination of parental rights. The Office of Vital Statistics of the Department of Health shall not record a claim of paternity after the date that a petition for termination of parental rights is filed.
§ 63.054(1), Fla. Stat. (2007) (emphasis supplied). The notice provision, outlined in the termination of parental rights provision of the adoption statute, states that an "unmarried biological father, by virtue of the fact that he has engaged in a sexual relationship with a woman, is deemed to be on notice that a pregnancy and an adoption proceeding regarding that child may occur and that he has a duty to protect his own rights and interest.” § 63.088(1), Fla. Stat. (2007) (emphasis supplied).

. The Servicemembers Civil Relief Act applies to "any judicial or administrative proceeding commenced in any court or agency in any jurisdiction subject to this Act,” except criminal proceedings. 50 U.S.C. app. § 512(b) (2007). Its purpose is "to provide for the temporary suspension of judicial and administrative proceedings and transactions that may adversely affect the civil rights of service-members during their military service.” 50 U.S.C. app. § 502 (2007). In accordance with that objective, the "period of a service-member's military service may not be included in computing any period limited by law, regulation, or order for the bringing of any action or proceeding in a court, or in any board, bureau, commission, department, or other agency of a State (or political subdivision of a State) or the United States by or against the servicemember or the service-member’s heirs, executors, administrators, or assigns.” 50 U.S.C. app. § 526(a) (2007). The tolling provision is "unconditional” in the sense that it applies wherever the service-member is deployed and regardless of his knowledge of the proceedings: Once military service is shown, tolling is automatic. Ricard v. Birch, 529 F.2d 214, 217 (4th Cir.1975).

. The final order also granted C.L.G.'s motion for return of minor child, denied a motion to appoint guardian ad litem that D.P. and L.P. had filed, and ruled that C.L.G. and A.R.L. were entitled to immediate custody of their child.